J-A26005-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| JOSHUA MILLER | : | IN THE SUPERIOR COURT |
| | : | OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| FESTIVAL FUN PARKS, LLC D/B/A | : | |
| PALACE ENTERTAINMENT, T/D/B/A | : | |
| KENNYWOOD | : | No. 92 WDA 2025 |
| | : | |
| Appellants | : | |

Appeal from the Order Entered January 13, 2025
In the Court of Common Pleas of Allegheny County
Civil Division at No:  NO. GD-24-004627

BEFORE:  OLSON, J., STABILE, J., and KING, J.

MEMORANDUM BY STABILE, J.:                     **FILED: July 30, 2026**

Appellant, Festival Fun Parks, LLC, d/b/a Palace Entertainment, t/d/b/a Kennywood, appeals from an order overruling its preliminary objections to the complaint in the nature of a motion to compel arbitration.  We affirm.

On April 22, 2024, Appellee Joshua Miller filed a class action against Appellant alleging violations of the Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. § 201-1—201-10 and unjust enrichment. According to Appellee's complaint, Appellant is an amusement park in Allegheny County, the Steel Curtain roller coaster is a "flagship attraction" at the amusement park.  Appellee alleges that Appellant knew well in advance of the 2024 season that the Steel Curtain would be unavailable for the 2024 season but intentionally withheld this information to avoid losing season pass holders.  Unaware that the Steel Curtain would be closed, Appellee bought a

season pass that allowed him access to the Kennywood amusement park for the entire 2024 season. Based on this alleged deceptive conduct, Appellee sought damages for himself and all other similarly situated persons.

On June 14, 2024, Appellant filed a motion to compel arbitration asserting that Appellee agreed to arbitrate this dispute under the Terms and Conditions of his agreement to purchase his season pass. The parties submitted briefs relating to Appellant's motion as well as a Joint Stipulation of Facts.

The Joint Stipulation summarized the process through which Appellee purchased his season pass. Appellee first went to the website https://www.kennywood.com and clicked the "Season Passes" hyperlink, which took him to the webpage https://www.kennywood.com/buy-tickets/season-passes. There, he had the option to purchase Gold Season Passes, Platinum Season Passes, Silver Season Passes or Bronze Season Passes. Appellee clicked the "Buy Now" hyperlink in the Gold Season Pass box, which took him to the webpage https://www.kennywood.com/buy-tickets/season-passes/selectpasses. Appellee entered the number 1 into the box to indicate the number of passes he wanted to purchase.

At this point, a hyperlink captioned "Continue" popped up, which Appellee clicked. This took him to the webpage https://www.kennywood.com/buy-tickets/season-passes/fill-form, wherein he filled in his personal information, which included his first name, last name, email, phone, date of birth, country, street, city and zip code.

Immediately following the last space in which Appellee filled in his zip code was the following:

☐ You are purchasing tickets valid at Kennywood, West Mifflin, USA. All tickets are subject to the park's Chaperone Policy.  For your protection, you may be asked for valid ID when you redeem your voucher.  No refunds under any circumstances, including loss or theft.  Tickets are not valid for resale. Attraction availability may be limited and varies from day-to-day; subject to change without advanced notice.  Please visit our Rules and Policies page for details.*

* It is mandatory to accept these terms and conditions to complete the purchase process.

We will refer to this as "Purchase Box I."

Immediately below Purchase Box I were four (4) hyperlinks captioned: "Privacy Policy," "Operating Rules," "Terms&Conditions" and "ADA Accessibility."

The Joint Stipulation states, "**If a purchaser of season passes clicks the "Terms&Conditions" hyperlink**, [he is] taken to the webpage https://www.kennywood.com/terms-of-use, which contains Appellant's "Terms of Use."  Joint Stipulation, ¶ 10 (emphasis added).

The Terms of Use document is ten pages of small, single-spaced print. It states in relevant part:

**Festival Fun Parks LLC's Terms of Use**

**Last Updated: August 7, 2023**

**IMPORTANT NOTICE: THESE TERMS CONTAIN A BINDING ARBITRATION PROVISION AND CLASS ACTION WAIVER. IT AFFECTS YOUR LEGAL RIGHTS AS DETAILED IN THE**

**ARBITRATION AND CLASS ACTION WAIVER SECTION BELOW. PLEASE READ CAREFULLY.**

## 1. Acceptance of Terms of Use

These Terms and Conditions ("Terms") govern your access to and use of the online and offline services and offerings (collectively, "Services") by Festival Fun Parks LLC dba Palace Entertainment, including our affiliates and subsidiaries (collectively, "Palace," "we," "us," or "our"). These Terms apply to all Services, including any website or mobile application we make available to you, the purchase of tickets to theme parks or reservations of lodging at properties owned or operated or managed by Palace (such parks and properties are hereinafter each a "Park") and your visit to or use of any services or facilities in the Parks.

**PLEASE READ THE TERMS THOROUGHLY AND CAREFULLY. BY USING THE SERVICES, YOU AGREE TO BE BOUND BY THESE TERMS. IF YOU DO NOT AGREE TO THESE TERMS, THEN YOU MAY NOT ACCESS OR USE THE SERVICES.**

All references to "you" or "your," as applicable, mean the person who accesses, uses, and/or participates in the Services in any manner, and each of your heirs, assigns, and successors. If you use the Services on behalf of an entity or another individual, you represent and warrant that you have the authority to bind that entity or individual, your acceptance of the Terms will be deemed an acceptance by that entity or individual, and "you" and "your" herein shall refer to that entity, its directors, officers, employees, and agents.

\*      \*      \*

## 14. Arbitration and Class Action Waiver

**PLEASE READ THIS SECTION CAREFULLY – IT MAY SIGNIFICANTLY AFFECT YOUR LEGAL RIGHTS, INCLUDING YOUR RIGHT TO FILE A LAWSUIT IN COURT.**

*a. Initial Dispute Resolution*

The parties shall use their best efforts to settle any dispute, claim, question, or disagreement and engage in good faith negotiations which shall be a condition to either party initiating a lawsuit or

arbitration. Failure to engage in this process could result in the award of fees against you in arbitration.

*b. Binding Arbitration*

If the parties do not reach an agreed upon solution within a period of 30 days from the time informal dispute resolution begins under the Initial Dispute Resolution provision, then either party may initiate binding arbitration as the sole means to resolve claims, subject to the terms set forth below. Specifically, all claims arising out of or relating to these Terms (including their formation, performance, and breach), the parties' relationship with each other and/or your use of the Services, including your purchase or use of Tickets, shall be finally settled by binding arbitration administered by JAMS in accordance with the provisions of its Streamlined Arbitration and Procedures, excluding any rules or procedures governing or permitting class or representative actions.

Except as set forth in herein, the arbitrator, and not any federal, state or local court or agency, shall have exclusive authority to resolve all disputes arising out of or relating to the interpretation, applicability, enforceability or formation of these Terms, including, but not limited to any claim that all or any part of these Terms are void or voidable, whether a claim is subject to arbitration, and any dispute regarding the payment of JAMS administrative or arbitrator fees (including the timing of such payments and remedies for nonpayment). The arbitrator shall be empowered to grant whatever relief would be available in a court under law or in equity. The parties agree that the arbitrator may allow the filing of dispositive motions if they are likely to efficiently resolve or narrow issues in dispute. The arbitrator's award shall be written, and binding on the parties and may be entered as a judgment in any court of competent jurisdiction. No arbitration award or decision will have any preclusive effect as to issues or claims in any dispute with anyone who is not a named party to the arbitration.

The Streamlined Arbitration Rules governing the arbitration may be accessed at www.jamsadr.com or by calling JAMS at (800) 352-5267. If you commence arbitration in accordance with these Terms, you will be required to pay the applicable initiation fee (which in 2021 was $250) to initiate the arbitration. To the extent the filing fee for the arbitration exceeds the cost of filing a lawsuit,

the arbitrator may require Palace to pay the additional cost. You are responsible for your own attorneys' fees unless the arbitration rules and/or applicable law provide otherwise. If the arbitrator finds the arbitration to be non-frivolous, Palace will pay all of the actual filing and arbitrator fees for the arbitration, provided your claim does not exceed $75,000. For claims above $75,000, fees and costs will be determined in accordance with applicable JAMS rules. The arbitration rules permit you to recover attorney's fees in certain cases.

Any arbitration demand or counterclaim asserted by either party must contain sufficient information to provide fair notice to the other party of the asserting party's identity, the claims being asserted, and the factual allegations on which they are based. The arbitrator and/or JAMS may require amendment of any demand or counterclaim that does not satisfy these requirements. The arbitrator has the right to impose sanctions in accordance with JAMS Rule 24 for any claims the arbitrator determines to be frivolous or improper (under the standard set forth in Federal Rule of Civil Procedure 11).

The parties agree that JAMS has discretion to modify the amount or timing of any administrative or arbitration fees due under JAMS's Rules where it deems appropriate, provided that such modification does not increase the costs to you, and you waive any objection to such fee modification. The parties also agree that a good-faith challenge by either party to the fees imposed by JAMS does not constitute a default, waiver, or breach of this Section while such challenge remains pending before JAMS, the arbitrator, and/or a court of competent jurisdiction.

The parties understand that, absent this mandatory provision, they would have the right to sue in court and have a jury trial. They further understand that, in some instances, the costs of arbitration could exceed the costs of litigation and the right to discovery may be more limited in arbitration than in court.

*c. Location*

If you are a resident of the United States, arbitration will take place at any reasonable location within the United States convenient for you. For residents outside of the United States, arbitration shall be initiated in the Allegheny County, Pennsylvania, United States of America, and you and Palace agree

to submit to the personal jurisdiction of any federal or state court in Allegheny County, Pennsylvania, in order to compel arbitration, to stay proceedings pending arbitration, or to confirm, modify, vacate or enter judgment on the award entered by the arbitrator.

Terms Of Use Document at 1, 7-8. The arbitration text printed above is on pages 7-8 of this document. *Id.*

Appellee did not recall reviewing the Terms of Use. He believes he simply clicked Purchase Box I and moved forward to the next stage of the purchase process. Joint Stipulation at ¶¶ 11-12. Had he not clicked Purchase Box I, he would not have been permitted to move forward to the next stage. Instead, he would have received a message in red type, "This field is required." *Id.* at ¶¶ 14-15.

The next stage of the payment process required Appellee to fill out his name, address and zip code in another webpage. Immediately following the last space in which Appellee filled in his zip code was the following:

☐ You are purchasing tickets valid at Kennywood, West Mifflin, USA. All tickets are subject to the park's Chaperone Policy. For your protection, you may be asked for valid ID when you redeem your voucher. No refunds under any circumstances, including loss or theft. Tickets are not valid for resale. **Attraction availability may be limited and varies from day-to-day; subject to change without advanced notice. Please visit our Rules and Policies page for details.\***

☐ Yes, I want to receive email, newsletters, and special events and offers from the Park.

\* It is mandatory to accept these terms and conditions to compete the purchase process.

We will refer to this as "Purchase Box II." Immediately below Purchase Box II were four (4) hyperlinks captioned "Privacy Policy," Operating Rules," Terms&Conditions" and "ADA Accessibility."

Once again, Appellee did not recall reviewing the Terms of Use. He believes he simply clicked Purchase Box II and moved forward to the next stage of the purchase process. Joint Stipulation at ¶¶ 19-20. Had he not clicked Purchase Box II, he would not have been permitted to move forward to the next stage. Instead, he would have received a message in red type, "This field is required." *Id.* at ¶¶ 22-23.

On January 13, 2025, following oral argument, the trial court denied Appellant's motion to compel arbitration. This timely appeal followed. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

The trial court stated in its March 24, 2025 opinion that this Court's decision in *Chilutti v. Uber Technologies, Inc.*, 300 A.3d 430 (Pa. Super 2023) (*en banc*) ("*Chilutti I*"),[1] requires internet agreements to "explicitly stat[e] on the registration website and application screens that a consumer is waiving a right to a jury trial when they agree to the company's 'terms and conditions,' and the registration process cannot be completed until the consumer is fully informed of that waiver. Opinion, 3/24/25, at 3. The trial court continued that "the purchase agreement did not require the purchaser

---

[1] One year after the trial court's opinion, our Supreme Court vacated *Chilutti I* on jurisdictional grounds described in further detail below. *See Chilutti v. Uber Technologies, Inc.*, —Pa.—, 349 A.3d 826, 828 (2026) ("*Chilutti II*").

to click on the "Terms & Conditions" link that contained the arbitration provision or verify that he read and understood the Terms & Conditions." *Id.* The court then concluded that Appellee failed *Chilutti I's* test

> as the registration page where [Appellee] entered his personal information did not contain any notices regarding the waiver of a jury trial or agreement to be bound by arbitration. Further, the box where [Appellee] must affirmatively "click" does not advise that the purchaser is agreeing to be bound by the terms and conditions in the hyperlink. A purchaser must choose to 'click through' to the terms and conditions page to be advised of the arbitration clause, but reviewing the terms and conditions page is not necessary to complete the purchase of a season pass. Therefore, because the waiver of the right to jury trial is not expressly stated on the registration screen, the [*Chilutti I*] test is not met.

Opinion at 3-4.

Appellant raises three issues in this appeal, which we reorganize for purposes of convenience:

> 1) The question of whether a valid arbitration agreement exists must be addressed using "ordinary state-law principles governing the formation of contracts[.]" *Cardinal v. Kindred Healthcare, Inc.*, 155 A.3d 46, 53 (Pa. Super. 2017) (citation omitted). Did the Trial Court err by concluding that no valid agreement to arbitrate was formed in this case, despite [Appellee] (1) receiving reasonably conspicuous notice of FFP's Terms and Conditions, (2) objectively manifesting his assent to those Terms, and (3) pursuing claims within the scope of the arbitration agreement?
>
> 2) [Appellee] acknowledged that he had notice of FFP's Terms and Conditions, writing, "Plaintiff agreed to Defendant's Stipulation of Facts, as they were likely the Terms and Conditions to which Plaintiff and all those similarly situated clicked on[.]" R.108a. Given this concession, did the Trial Court err by declining to send [Appellee's] claims to arbitration, either because the dispute is within the scope of the arbitration agreement or because the

arbitrability of Appellee's claims is a question to be resolved by the arbitrator under the agreement's delegation clause?

3) This Court in [**Chilutti I**] announced a notice requirement specifically for online arbitration agreements. Preexisting U.S. Supreme Court precedent interpreting the Federal Arbitration Act ("FAA"), however, expressly holds that "[c]ourts may not, however, invalidate arbitration agreements under state laws applicable only to arbitration provisions." **Doctor's Assocs., Inc. v. Casarotto**, 517 U.S. 681, 687 (1996) (emphasis original). Did the Trial Court therefore err when it used the **Chilutti** rule—which applies to arbitration agreements only—to find that [Appellee] was not bound to arbitrate his claims?

Appellant's Brief at 5-6.

Before we address the merits of the case, we must first address the issue of whether the trial court's order denying Appellant's motion to compel arbitration is appealable. See **McCrossin v. Comcast Spectacor, Inc.**, 311 A.3d 1115, 1121 (Pa. Super. 2024).

Pennsylvania Rule of Appellate Procedure 311(a)(8) provides that an appeal may be taken as of right from "[a]n order that is made final or appealable by statute or general rule, even though the order does not dispose of all claims and of all parties." Pa.R.A.P. 311(a)(8). The Revised Statutory Arbitration Act provides that "[a]n appeal may be taken from ... an order denying a motion to compel arbitration…" 42 Pa.C.S.A. § 7321.29(a)(1).

We have further held:

Alternative dispute resolution agreements that merely include arbitration as only one of a number of possible methods of resolving disputes are not arbitration agreements, and denial of enforcement of such dispute resolution agreements is not appealable as of right…Where the parties' agreement requires arbitration, however, the denial of enforcement is appealable as

- 10 -

of right even though the parties' agreement includes some pre-arbitration settlement procedures.

*McCrossin*, 311 A.3d at 1121.

The appeal before us satisfies these requisites. It is appealable because it is from an order denying a motion to compel arbitration. Moreover, the dispute resolution provisions at issue plainly are arbitration provisions. Although they provide a pre-arbitration settlement procedure (good faith negotiations), they require binding arbitration to resolve all disputes not settled by agreement of the parties. We thus turn to the issues that Appellant raises in this appeal.

Our review of a claim that the trial court improperly denied preliminary objections in the nature of a motion to compel arbitration is limited to determining whether the trial court's findings are supported by substantial evidence and whether the trial court abused its discretion in denying the petition. *Cook v. Philadelphia Federal Credit Union*, 353 A.3d 803, 809 (Pa. Super. 2026).

We begin by addressing Appellant's argument that the provision in the parties' agreement to submit the present dispute to arbitration is valid and enforceable. "Whether an agreement to arbitrate disputes exists is a question of law." *Duffy v. Tatum*, 354 A.3d 14, 20 (Pa. Super. 2026). "When we review questions of law, our standard of review is limited to determining whether the trial court committed an error of law." *Id.* Courts apply a two-part test in determining whether to compel arbitration. "The first

determination is whether a valid agreement to arbitrate exists. The second determination is whether the dispute is within the scope of the agreement."

*Id.*

We have stated:

Pennsylvania has a well-established public policy that favors arbitration, and this policy aligns with the federal approach expressed in the Federal Arbitration Act.[2]  [T]he fundamental purpose of the [FAA] is to relieve the parties from expensive litigation and to help ease the current congestion of court calendars.  Its passage was a congressional declaration of a liberal federal policy favoring arbitration agreements.

This policy, however, was not intended to render arbitration agreements more enforceable than other contracts, and the FAA had not been designed to preempt all state law related to arbitration.  Rather, when addressing the specific issue of whether there is a valid agreement to arbitrate, courts generally should apply ordinary state-law principles that govern the formation of contracts, but in doing so, must give due regard to the federal policy favoring arbitration.

*Duffy*, 2026 WL at 587629, *4.

Under Pennsylvania law, the ordinary state-law principles governing formation of contracts are well-settled.  The elements of an enforceable contract are an "offer, acceptance, consideration, consideration or mutual meeting of the minds."  *Schreiber v. Olan Mills*, 627 A.2d 806, 808 (Pa. Super 1993).  "[T]here must be a meeting of the minds; the very essence of an agreement is that the parties mutually assent to the same thing."  *Id.*

---

[2] 9 U.S.C. Ch. 1 §§ 1-16 ("FAA").  The FAA encompasses all of Title 9 of the United States Code, but Chapters 2 and 3 of Title 9 are not relevant to this appeal because they concern foreign and international arbitration.

"Whether particular conduct expresses an offer and acceptance must be determined on the basis of what a reasonable person in the position of the parties would be led to understand by such conduct under all of the surrounding circumstances." **Mountain Properties, Inc. v. Tyler Hill Realty Corp.**, 767 A.2d 1096, 1101 (Pa. Super. 2001).

Three recent decisions relating to enforceability of arbitration provisions in internet agreements, **Chilutti I, Duffy**, and **Pierce v. Empower Finance Inc.**, —A.3d—, 2026 WL 1192069 (Pa. Super., May 1, 2026), require examination. **Chilutti I** pertained to a civil action by Shannon and Keith Chilutti against Uber and its subsidiaries. Shannon Chilutti registered for an Uber rider account on Uber's website, which required her to click on a blue "Create Account" button at the bottom of the webpage. Below the "Create Account" button, a putative user would have seen the following: "By clicking 'Create Account', you agree to Uber's Terms and Conditions and Privacy Policy." The words "Terms and Conditions" and "Privacy Policy" were hyperlinks, which, **if clicked on**, would have redirected the user to another website that would then display a 12-page document. The hyperlinks were smaller than the other wording on the webpage and in a blue-colored font that was not underlined. Starting on the ninth page, the "Terms and Conditions" contain a "Dispute Resolution" Section, which provided, with limited exceptions, that disputes arising between the parties would be settled by

binding arbitration. Shannon Chilutti only recalled clicking on the blue "Create Account" button to create the account; she did not see any hyperlinks.

Keith Chilutti registered for an Uber account on his IPhone. Prior to the creation of his, he viewed a screen that stated, "By tapping the arrow below, you agree to Uber's Term of Use and acknowledge that you have read the Privacy Policy." Below, in smaller font, it stated, "To learn more, see our Terms of Use and Privacy Policy." "Terms of Use" and "Privacy Policy" were blue-colored hyperlinks that were not underlined. To proceed with the registration process, a user would not have to click on the links to proceed to the next screen. The "Terms of Use" was a ten-page document that contained an "Arbitration Agreement" on the second page requiring all disputes between the parties to go to binding arbitration. Keith Chilutti testified that he did not click on either hyperlink during the registration process, so he never reviewed the documents.

Shannon Chilutti suffered injuries while riding in a car provided by Uber. *Id.*, 300 A.3d at 434. The Chiluttis filed a negligence suit against Uber and its subsidiaries. The defendants moved to compel arbitration, arguing that "the couple's conduct on the company's website and application — when they registered for the ridesharing service — signified that they agreed to be bound by the mandatory arbitration provision found in the hyperlinked terms and conditions." *Id.* at 435. The trial court held that the arbitration provision in the parties' agreement was enforceable. The plaintiffs appealed to this Court,

contending that we had jurisdiction under Pa.R.A.P. 313, the rule of appellate procedure embodying the collateral order doctrine.[3]

This Court, sitting *en banc*, held in **Chilutti I** that the order requiring arbitration was appealable under Rule 313. On the merits, we reversed, holding that the arbitration provision was not enforceable. We began by noting the "copious usage" of arbitration provisions in present day contracts and observed that such provisions have weakened the right to a jury trial in civil proceedings found in the Seventh Amendment to the United States Constitution. *Id.* at 441. We further noted that the weakening of the constitutional right to a jury trial has become greater in the context of internet contracts where a binding arbitration agreement (1) can be inconspicuous; (2) may be contained in a hyperlink that is separate from the binding action like a "click" of an "I agree to these terms" button; (3) may not require a party's signature to be in direct relation to the waiver; and (4) may not require that a party even review the agreement to be bound by it. *Id.* at 442.

To remedy the dilution of the right to a jury trial, we concluded that "a court should not enforce an arbitration provision in an Internet purchase agreement unless the court concludes that the party agreeing to an arbitration provision was aware that they were waiving the right." *Id.* at 442. We added

---

[3] Unlike the present case, the order in **Chilutti I** was not appealable as of right under 42 Pa.C.S.A. § 7321.29 and Pa.R.A.P. 311(a)(8) because it granted preliminary objections seeking to compel arbitration. Consequently, the plaintiffs purported to appeal under a different rule, Pa.R.A.P. 313.

that a waiver "must be clearly described and understood to be giving up a constitutional right to a jury trial." *Id.* at 442-43.

We held that a valid arbitration agreement did not exist between the plaintiffs and Uber, and therefore plaintiffs were "entitled to invoke their constitutional right to a jury trial." *Id.* at 451. We reasoned that "Uber's website and application did not provide reasonably conspicuous notice of the terms to which [the plaintiffs] were bound" where "the 'terms and conditions' agreement was encapsulated in tiny, blue font at the very bottom of a cluttered webpage. The relevant text was not underlined or capitalized." *Id.* at 449. Other terms and conditions only could be reviewed in small font and on the fifth screen of the registration process after the user had already provided substantive personal information. *Id.*

"[T]he constitutional right to a jury trial should be afforded the greatest protection under the courts of this Commonwealth," we emphasized. *Id.* at 449. "To demonstrate a party's unambiguous manifestation of assent to arbitration," it was necessary to satisfy two conditions:

> (1) explicitly stating on the registration websites and application screens that a consumer is waiving a right to a jury trial when they agree to the company's "terms and conditions," and the registration process cannot be completed until the consumer is fully informed of that waiver; and (2) when the agreements are available for viewing after a user has clicked on the hyperlink, the waiver should not be hidden in the "terms and conditions" provision but should appear at the top of the first page in bold, capitalized text.

*Id.* at 449-50.

- 16 -

The Supreme Court granted Uber's petition for allowance of appeal and vacated our decision on the ground that the trial court's order was not appealable under Pa.R.A.P. 313. *Chilutti II*, 349 A.3d at 828. The Court remanded the matter with instructions to quash the appeal. *Id.* The Court did not reach the substantive issue whether the arbitration provision was enforceable.

On March 3, 2026, one month after the Supreme Court's decision in *Chilutti II*, a three-judge panel of this Court issued a precedential opinion in *Duffy*. "Borrow[ing] substantially" from *Chilutti I's* substantive analysis, *Duffy* held that the arbitration provision under review was not enforceable. *Id.*, 354 A.3d at 19 n.2.

In *Duffy*, the plaintiff, Duffy, used a web browser on his iPad to access the website of Dolly, Inc. On the website, Duffy clicked "Book a Dolly" and selected various moving services. The website required Duffy to check a box labeled "By checking this box I accept the Dolly Terms of Service" before Duffy was permitted to register and purchase services. The phrase "Dolly Terms of Service" was underlined and was a hyperlink to Dolly's full Terms of Service Agreement. If Duffy clicked on the hyperlink, Dolly's Terms of Service Agreement would appear in a new web browser window.

The website did not require Duffy to click the underlined "Dolly Terms of Service" hyperlink to register and purchase services. Nor did the website require Duffy to scroll to the bottom of the Terms of Service Agreement to

register and purchase services. Page 3 of the Terms of Service Agreement included a provision that any dispute between the parties would first proceed to mediation, and if mediation was unsuccessful, would then proceed to binding arbitration. Dolly's website and application screen did not explicitly state that the consumer was waiving his right to a jury trial when he agreed to the terms of service.[4]

_____

[4] **Duffy** observed:

> [T]here are at least four different types of online consumer contracts (browsewrap, clickwrap, scrollwrap, and sign-in wrap) as outlined by the Supreme Court of Maine:
>
> "Browsewrap" exists where the online host dictates that assent is given merely by using the site. "Clickwrap" refers to the assent process by which a user must click "I agree," but not necessarily view the contract to which [he or] she is assenting. "Scrollwrap" requires users to physically scroll through an internet agreement and click on a separate "I agree" button in order to assent to the terms and conditions of the host website. "Sign-in wrap" couples assent to the terms of a website with signing up for the use of the site's services.
>
> Of these four online contract types, only a scrollwrap agreement requires a user actually to view (albeit not necessarily read) the terms of the online contract before manifesting assent. Courts have consistently found scrollwrap agreements enforceable because they present the consumer with a realistic opportunity to review the terms of the contract and they require a physical manifestation of assent.

*Id.*, 354 A.3d at 23-24 (citing **Sarchi v. Uber Technologies, Inc.**, 268 A.3d 258, 266 (Me. 2022)). **Duffy** found that the agreement under review was

> a combination of sign-in wrap and clickwrap as Dolly's website did not require Duffy to scroll through the terms by clicking agree.

*(Footnote Continued Next Page)*

- 18 -

Duffy filed a civil action against Dolly alleging that he suffered injuries during Dolly's performance of moving services. Dolly filed preliminary objections to the complaint claiming that the parties agreed to alternative dispute resolution in the form of mediation and then arbitration. The court overruled the preliminary objections,[5] and Dolly appealed to this Court.

This Court affirmed. We observed that

> this case involves an overarching question of whether a person should be deprived of their constitutional right to a jury trial when they ostensibly enter into an arbitration agreement through hyperlinked terms of service on a website that the person never clicked on, viewed, or read. In evaluating this question, we stress our Commonwealth's guarantee that its citizens have a constitutional right to a jury trial that remains inviolate. **See** Pa.Const. art 1, § 6 ("Trial by jury shall be as heretofore, and the right thereof remain inviolate."). "Inviolate" is defined as "[f]ree from violation; not broken, infringed, or impaired." Black's Law Dictionary, "INVIOLATE" (11th ed. 2019).

*Id.* at 20; *see also id.* at 24 (our Supreme Court has held that "the right to a jury trial in a civil action is a fundamental aspect of our system of law) (citing ***Bruckshaw v. Frankford Hosp. of City of Philadelphia***, 619 Pa. 135, 58 A.3d 102, 109 (2012)).

---

> However, Duffy could not proceed with the sign-up process without clicking a box that stated "By checking this box I accept the Dolly Terms of Service" and thereby binding himself to the waiver of jury trial in the event of a dispute.

*Id.* at 24.

[5] This order, like the order in the present case, was appealable under 42 Pa.C.S.A. § 7321.29(a)(1) and Pa.R.A.P. 311(a)(8) because it overruled preliminary objections to compel arbitration.

- 19 -

We emphasized that under Pennsylvania law, arbitration provisions in online purchase agreements

> should only be enforced if it is clear that the parties agreeing to it were aware that they were resultantly waiving their constitutional right to a jury trial. Where the provision is buried within hyperlinks or in tiny print, there is a high probability the person was not aware of the arbitration provision, and it is therefore unenforceable.

*Id.* at 22. "[I]n criminal matters [and] also in the civil arena, a person must be fully informed of his constitutional right to a jury trial and the effect of waiving that right." *Id.* at 23. Furthermore, in the civil arena, "courts will only uphold a confession of judgment when it is clear that the party that agreed to it was aware that [he] waived [his] constitutional right to a jury trial." *Id.* at 22. We held that the same standards should apply to online contracts with arbitration provisions:

> If this case involved a confession of judgment, this Court would find that the circumstances here mandate an opening or striking of the judgment because of the discreet use of the provision in question. We would hold a criminal defendant did not knowingly and intelligently waive his right to a jury trial on these facts as well. We cannot find any reason why a similar analysis should not apply in a case such as this where the constitutional right to a jury trial is simply clicked away without any protection that our law has so frequently applied in other circumstances.

*Id.* at 25.

To demonstrate "a person's unambiguous manifestation of assent to arbitration," *id.* at 24, the agreement had to satisfy two conditions:

> (1) explicitly stating on the registration website and application screens that a consumer is waiving their right to a jury trial when the person agrees to the seller's terms of service and the

registration cannot be completed until the person is fully informed of that waiver; and (2) when the agreements are available for viewing after a user has clicked on a hyperlink, the waiver should not be hidden in the middle of the document but should appear prominently in bold, capitalized text.

*Id.* "It is important to note," we added, "that the average internet user would find the term arbitration ambiguous. Without a definition of its meaning, the average internet user could think that arbitration is simply another step in the litigation process that does not require waiving their constitutional right to a jury trial." *Id.* at 24. For this reason, we stated, "arbitration must be defined within the arbitration agreement and … the waiver of one's right to a jury trial must be prominently displayed." *Id.* at 25.

The agreement in *Duffy* failed to satisfy these standards. The agreement was

> a combination of *sign-in wrap* and *clickwrap* as Dolly's website did not require Duffy to scroll through the terms by clicking agree. However, Duffy could not proceed with the sign-up process without clicking a box that stated "By checking this box I accept the Dolly terms of service" and binding himself to the waiver of jury trial in the event of a dispute…
>
> Duffy never clicked on the hyperlink providing the terms of service. Dolly's website and application screen does not explicitly state that the consumer is waiving [his] right to a jury trial when [he] agree[s] to the terms of service. Duffy was able to complete his registration process without being fully informed of the waiver of his right to a jury trial. The hyperlink that opens the terms of service hides the arbitration agreement within the middle of the document and does not place it in prominently in the document. Further, the arbitration provision never defines arbitration and does not state explicitly that a user is waiving his right to trial by jury. Therefore, it is clear Duffy was never informed in an explicit and upfront manner that he was waiving his constitutional right to seek damages through a jury trial.

- 21 -

*Id.* at 24, 25 (emphasis in original).  Therefore, the trial court properly overruled Dolly's preliminary objections, because "Duffy never saw the terms of service and did not unambiguously assent to arbitration.  Dolly's website did not provide reasonably obvious notice of its terms of service and, consequently, there was no meeting of the minds." *Id.*  at 25.

Most recently, in **Pierce**, Empower, a technology company, offered immediate cash advances of up to $300 through a smartphone app. Subscribers must download the app, link the app to the subscriber's bank account and then agree to Empower's terms of service.  The principal of the cash advance, and attendant fees, were later debited by Empower from the linked bank account as soon as the subscriber's paycheck has been deposited. The terms of service included an arbitration clause that stated, "You agree that, by entering into these Terms, you and Empower are each waiving the right to a trial by jury or to participate in a class action.  Your rights will be determined by a neutral arbitrator, not by a jury or jury."  However, as in **Duffy**, the application process was not structured in a manner that required the applicant to review the arbitration clause or assent unambiguously to arbitration.

The plaintiff, Pierce, filed a class action alleging that Empower charged her and other applicants interest rates that exceeded the rates permitted under Pennsylvania law.  Empower filed preliminary objections seeking to compel arbitration.  The trial court overruled Empower's preliminary

objections, and Empower appealed to this Court. Applying **Chilutti I** and **Duffy**, we affirmed the trial court's order. **Id.**, 2026 WL at 1192069, *7 ("Empower's application screens did not explicitly state that Pierce would be waiving the right to a jury trial by agreeing to Empower's "terms and conditions," or that the registration process could not be completed until the consumer is fully informed of that waiver. Thus, we hold that the trial court did not err in overruling Empower's preliminary objections seeking to compel arbitration").

Applying the standards articulated in **Chilutti I** and adopted in our precedential opinions in **Duffy** and **Pierce**, we conclude that the trial court properly denied Appellant's motion to compel arbitration. As in **Duffy**, the present agreement is a combination of sign-in wrap and clickwrap. Appellee could not complete the purchase process without clicking Purchase Box I and Purchase Box II. Both purchase boxes state, "It is mandatory to accept these terms and conditions to compete the purchase process." Neither purchase box states, however, that Appellee waived his right to a jury trial by accepting these terms and conditions. Neither purchase box requires Appellee to click on the hyperlink providing the terms and conditions or to review the terms and conditions. Appellee did not click on this hyperlink. The Terms and Conditions document is ten pages consisting mostly of small, single-spaced print. The arbitration provision is not prominently featured; it is buried on pages 7 and 8 of this document. This provision does not define arbitration or

state explicitly that a user is waiving his right to a jury trial. Indeed, the term "waive" does not appear at all. The terms used instead are oblique and indirect, "The parties understand that, absent this mandatory provision, they would have the right to sue in court and have a jury trial." Terms of Use Document at 8. Moreover, this sentence is in small print and is not bolded. Thus, as in **Duffy**, the structure of the on-line agreement allowed Appellee to complete the purchase process without learning that he waived his right to a jury trial. More pointedly stated, the agreement may easily trap an unwary customer such as Appellee into forfeiting a valuable constitutional right.

Since the agreement did not both conspicuously inform Appellee of his right to a jury trial and that he was waiving this right by agreeing to the terms of service, Appellee cannot be deemed to have knowingly consented to arbitration. Thus, there was no meeting of the minds, and the arbitration provision is unenforceable.

In his second argument, Appellant contends that Appellee conceded in the trial court that the arbitration provision applies to him. Appellant bases this argument on a statement in Appellant's response to Appellee's motion to compel arbitration, which provides "[Appellee] agreed to [the Joint Stipulation of Facts], as they were likely the Terms and Conditions to which [Appellee] clicked on …" Brief In Opposition To Appellant's Motion, 12/23/24, at 2. Appellee infers from this statement that Appellee actually reviewed the terms and conditions section of the agreement and thus read, and consented to, the

arbitration provision. We find this argument unpersuasive. As stated above, our review is limited to determining whether the trial court's decision to deny arbitration is supported by substantial evidence. **Cook**, 353 A.3d at 809. The Joint Stipulation states that Appellee did *not* recall reviewing the terms and conditions and simply clicked Purchase Box I and moved forward to the next stage of the purchase process. Joint Stipulation at ¶¶ 11-12. The Joint Stipulation thus provides substantial evidence that Appellee did *not* review the terms and conditions and did not consent to arbitration.

Third, and finally, Appellant argues that this Court's decision in **Chilutti I** is preempted by the Federal Arbitration Act ("FAA") and United States Supreme Court precedent. We disagree.

According to Appellant, the United States Supreme Court has consistently interpreted section 2 of the FAA, 9 U.S.C. § 2, to mean that arbitration agreements subject to the FAA must be evaluated under generally applicable contract law and cannot be invalidated "under state laws applicable only to arbitration provisions." Appellant's Brief at 36. Thus, Appellant claims, **Chilutti I** ran afoul of the FAA, and violated the Supremacy Clause, by creating a standard that applies only to on-line consumer arbitration provisions.[6] Appellant's Brief at 34-41.

---

[6] Appellant did not have the opportunity to object to **Duffy** and **Pierce** because it filed its briefs before we issued these decisions. Accordingly, we think it fair to regard Appellant's argument as a challenge to **Duffy** and **Pierce** as well as to **Chilutti I.**

The principle of federal preemption of state law derives from the Supremacy Clause in the second clause of Article VI of the United States Constitution. ***Arnoldy v. Forklift L.P.***, 927 A.2d 257, 263 (Pa. Super. 2007). Under the Supremacy Clause, federal law is "the supreme law of the land", and any conflicts between federal and state law must be resolved in favor of federal law. ***Id.***

Section 2 of the FAA provides that "[a] written provision in…a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction…shall be valid irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract[.]" 9 U.S.C. § 2. The FAA "requires courts to place arbitration agreements *on equal footing* with all other contracts." ***Kindred Nursing Centers Ltd. Partnership v. Clark***, 581 U.S. 246, 248 (2017) (cleaned up; emphasis added). Section 2 of the FAA

> establishes an equal treatment principle: A court may invalidate an arbitration agreement based on "generally applicable contract defenses" like fraud or unconscionability, but not on legal rules that "apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." ***AT&T Mobility LLC v. Concepcion***, 563 U.S. 333, 339 (2011). The FAA thus preempts any state rule discriminating on its face against arbitration—for example, a "law prohibit[ing] outright the arbitration of a particular type of claim." ***Id.***, at 341. And not only that: The Act also displaces any rule that covertly accomplishes the same objective by disfavoring contracts that (oh so coincidentally) have the defining features of arbitration agreements.

***Id.*** at 251.

"Pennsylvania has a well-established public policy that favors arbitration, and this policy aligns with the federal approach expressed in the [FAA]." **Pisano v. Extendicare Homes, Inc.**, 77 A.3d 651, 660 (Pa. Super. 2013). "This policy applies equally to all arbitration agreements." **MacPherson v. Magee Mem'l Hosp. for Convalescence**, 128 A.3d 1209, 1219 (Pa. Super. 2015) (*en banc*). Nevertheless, the policy favoring arbitration "was not intended to render arbitration agreements more enforceable than other contracts, and the FAA [was not] designed to preempt all state law related to arbitration." **Pisano**, 77 A.3d at 661 (cleaned up). "Thus, when addressing the specific issue of whether there is a valid agreement to arbitrate, courts generally should apply ordinary state-law principles that govern the formation of contracts, but in doing so, must give due regard to the federal policy favoring arbitration." **Id.** (cleaned up).

The purpose of the rule announced in **Chilutti I** and applied in **Duffy** and **Pierce** is to ensure that arbitration agreements protect the constitutional right to a jury trial enshrined in Article I, Section 6 of the Pennsylvania Constitution. **See** Pa. Const., Art. I, § 6 ("[t]rial by jury shall remain as heretofore, and the right thereof shall remain inviolate"); **Duffy**, 354 A.3d at 20, 24. This rule does not violate the FAA because it merely places arbitration agreements on "equal footing" with other types of agreements that must be certain that the waiver of a constitutional right is both informed and knowing; as in, agreements to permit confession of judgment in civil cases and

agreements by criminal defendants to waive their right to trial by jury. **Kindred Nursing**, 581 U.S. at 248.

To elaborate, our caselaw "holds that courts will only uphold a confession of judgment when it is clear that the party that agreed to it was aware that they waived their constitutional right to a jury trial." **Duffy**, 354 A.3d at 22 (citing, *inter alia*, **Graystone Bank v. Grove Estates, L.P.**, 58 A.3d 1277, 1283 (Pa. Super. 2012))[7]; **see also Dime Bank v. Andrews**, 115 A.3d 358, 365 (Pa. Super. 2015) ("strict construction [of warrants of attorney to confess judgment] may be constitutionally mandated in light of … due process attacks on cognovit clauses"). In criminal cases, historically, a criminal defendant's agreement to waive a jury trial has been subjected to a "much more rigorous process" than the waiver of a jury trial in an arbitration agreement. **Duffy**, 354 A.3d at 22. Waiver of a jury trial in a criminal case

> must be "approv[ed] by a judge of the court in which the case is pending[.]" **Commonwealth v. Smith**, 181 A.3d 1168, 1175 (Pa. Super. 2018) (citation omitted). Notably, Rule 620 provides that a waiver is valid only after "[t]he judge [] ascertain[s] from the defendant whether this is a knowing and intelligent waiver, and such colloquy shall appear on the record. The waiver shall be in writing, made a part of the record, and signed by the defendant, the attorney for the Commonwealth, the judge, and the defendant's attorney as a witness." Pa.R.Crim.P. 620.

---

[7] **Duffy** observed that **Graystone Bank** held a warrant of attorney to confess judgment was valid because it "appeared conspicuously in all caps on the very bottom of the penultimate page of the agreement and immediately preceded where the executor … signed at the top of the following, final page." **Duffy**, 354 A.3d at 22 (citing **Graystone Bank**, 58 A.3d at 1283).

*Id.* at 22-23.

Thus, our treatment of arbitration provisions in ***Chilutti I***, ***Duffy*** and ***Pierce*** do not discriminate against arbitration agreements; they merely impose the same burden and consequent protection that already govern agreements in other areas of Pennsylvania law where a constitutional right is being waived.

We also observe an important distinction between these decisions and ***Kindred Nursing***. In ***Kindred Nursing***, the estates of two deceased nursing home residents filed negligence actions against Kindred Nursing, an entity that operated nursing homes. Kindred Nursing argued that the estates could not bring these actions in state court, citing an arbitration agreement that representatives of the residents signed in their capacity as power of attorney. The Kentucky Supreme Court held that the arbitration agreement violated the nursing home residents' right to trial by jury under the Kentucky Constitution, because the power of attorney documents did not expressly permit the representatives to enter into arbitration agreements. The United States Supreme Court reversed on the ground that the Kentucky court's decision violated the FAA by failing to put arbitration agreements on an equal plane with other contracts. It appears from the United States Supreme Court's opinion that the power of attorney documents placed greater burdens on arbitration agreements than other agreements under Kentucky law. In the

present case, however, the rule in **Chilutti I**, **Duffy** and **Pierce** is consistent with burdens placed on other types of agreements under Pennsylvania law.

Appellant also argues that Appellee waived any objection to its preemption argument because Appellee failed to develop any argument of his own in his brief but merely incorporated by reference arguments made in amicus briefs submitted to our Supreme Court in **Chilutti II.** The decisions Appellant cites for this proposition, however, hold that *appellants* cannot simply incorporate arguments by reference made in other briefs. **See**, **e.g.**, **Commonwealth v. Briggs**, 12 A.3d 291, 342-43 (Pa. 2012). These decisions do not apply to appellees. Although the better practice would have been for Appellee to present his own argument, even if borrowing from other sources, this does not prevent us from affirming the order denying arbitration. Our Supreme Court has made clear that "a correct decision will be sustained" in an appeal "if it can be sustained for any reason whatsoever…" **Sherwood v. Elgart**, 117 A.2d 899, 901 (Pa. 1955); **see also Wilson v. Plumstead Tp. Zoning Hearing Bd.**, 936 A.2d 1061, 1065 n.3 (Pa. 2007) ("[t]his Court may affirm on any ground").[8]

---

[8] In his reply brief, Appellant argues for the first time that the arbitrator, not the trial court, must determine whether the parties' agreement should be subject to arbitration. Appellant has waived this argument because it cannot raise issues for the first time in a reply brief. **Reginelli v. Boggs**, 181 A.3d 293, 307 n.15 (Pa. 2018).

For these reasons, we affirm the order denying Appellant's motion to compel arbitration.

Order affirmed. Case remanded for further proceedings. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

7/30/2026